Ruffin, C. J.
 

 This suit is brought for the redemption of thirteen slaves, which the plaintiff alleges the defendant holds as a security only for the sum of g954, with the interest thereon.
 

 The bill was filed in November, 1837, and states that, being indebted to certain persons, the plaintiff, by way of security, eonveyed to Robert H. Burton several tracts of land, and also ten slaves, upon trust to sell, and out of the proceeds of sale to satifyffjje debts. That on the 8th of April, 1827, the trustee offered the negroes for sale and sold them all for cash; and that iff t(iát sale the defendant purchased a female slave, named Sue, and her four children, Jane, Anthony, Rachel.and. Jefferson, (who are mentioned byname in the deed) and also two others, Isaac and Mary, who were the issue of said Sue, born after the execution of the deed of trust; and that he gave for them the sum of $954. The bill charges that the plaintiff, finding that he would be unable to prevent a sale of the negroes, applied to the defendant to attend the sale and purchase the negroes; and that the defendant, who had long professed particular friendship for the plaintiff, agreed that lie would examine the property conveyed, and, if he thought it equal in value to the debts, that he would advance money to discharge the debts, and take a conveyance of the property as a security — that, accordingly, the defendant, upon examination, was satisfied that the pro - perty was good for the debt, and declared that it should not be sacrificed, but engaged that he would attend the sale, pay the debts by buying the property, and leave it in the plaintiff’s possession, until he should be able to redeem it, which Hoke declared he would not speedily press him to do. The bill further charges that before the sale several letters passed between the parties on the subject; and, particularly, that Hoke wrote a letter to the plaintiff, which contained a dis
 
 *159
 
 tinct agreement on his part to bny in the property
 
 on
 
 the terms set forth. That Hoke did attend the sale, and proposed, as had been agreed, that the whole property mentioned in the deed of trust should be oifered in a lump, and that he would bid the amount of the debt; but that the trustee declined to sell in that way, and that thereupon the defendant applied to the plaintiff far his letter before mentioned, and tore it up, saying to the plaintiff, that he would only be bound for such of the negroes as he might buy; that the trustee then proceeded to sell the twelve negroes, of which five were purchased by other persons, and the seven before mentioned were purchased by the defendant as aforesaid. The bill then charges that those seven ' negroes were worth at least $1,500, and from that that several other persons, who were ^re^J^^woOT^Mfce given much more for them, if they hi® not understoodfthat the defendant was bidding for the plptólti with a view to allow him time for reiemption. The bilffifurther charges, that in pursuance of t ti if retained the possession of the negroess¡ís}8^hgw§3¿»,TO November, 1831; at which time the defendant took into his possession those he had orignally purchased and two or three others who had been born in the interval, and that he has kept them ever since, until they have increased to the number first mentioned, and yielded large profits. The1 bill states, that although the negroes sold for more than enough to satisfy the debts secured by the deed of trust, yet the plaintiff was shortly afterwards obliged to sell his lands and all his other property to pay other debts; and that he was- prevented from applying for redemption sooner by his poverty.
 

 The answer states that the plaintiff was largely indebted to many persons besides those secured by the deed of trust; that among others he owed the defendant two debts, one for $91 52 cts., and the other for $82 60 cts.;' and another debt to the defendant and his partners of $378 87 cts. That the plaintiff mentioned, that it was the interest of all' his creditors-to attend the sale and make his property bring its value, otherwise they might not be,paid; and he urged the defendant in particular to do so. The defendant admits that he
 
 *160
 
 attended the sale, in the hope, of securing himself in some waJri and, with that view, that he proposed to pay the debts mentioned in the deed of trust, and take a conveyance of all the property to secure the payment of the sum so advanced, and of the debts aforesaid, to himself and to his partners,- and that the same. was refused. And, he States, that thereupon the negroes were set up for sale: the woman Sue and her four youngest children being put up in one lot and the others singly. That he, the defendant, bid for each lot, and purcased seven, at prices which, together, amounted to $954; and that he did not buy the others, because other persons bid more than he thought the slaves were worth. He also admits, that the plaintiff was very desirous of having the use of the woman Sue, as a servant in his family, and requested the defendant, if he purchased her and her younger children, to leave them with him until the defendant should want them; which the defendant says he agreed to do, in case he should purchase them, inasmuch as he had no immediate use for them, and their services were about equal to their tax, victuals and clothing. The defendant further admits it to be probable, that some' correspondence by letter took place between .the parties, before the sale; but he says, he cannot remember that there was any such correspondence, much less the contents of the letter from him to the plaintiff, or that he got the same back and destroyed it, as stated in- the bill; and he denies that any such thing took place, according to his recollection or belief. And the answer denies positively that if such letter did exist, that it contained any promise or agreement that the defendant would purchase the plaintiff’s property, or any part of it, for his benefit, and give him time to repay the purchase money, .and redeem it: or that such agreement existed'by parol, or that there was any conversation or understanding between, the parties to that effect, before or at the sale, or at any other time; and the defendant avers that all the allegations of the bill touching such right of redemption, or any agreement therefor, are unqualifiedly false, and that the defendant purchased fo.r, his own use exclusively. He denies, that he consented the negroes might remain with the .plaintiff with
 
 *161
 
 the view of preventing competition in bidding, and his be lief that it had such effect; but if it did, it must have been owing to the conduct of the plaintiff himself, for the defendant said nothing of that intention to any person. He also denies that the negroes brought less from the manner in which they were sold; for all the children of the woman were sold separately, except the four youngest, and they were too small to separate from the mother.- The answer further states, that in July, 1827, the defendant purchased at sheriff’s sale a tract of land containing 100 acres, being one of the tracts conveyed in the deed of trust to Mr. Burton and that whereon the plaintiff resided; and that he after-wards (in July 1828) purchased at sheriff’s sale a tract of land adjoining the above, which was sold as the property of James Nixon: and that so far from any of the said purchases being made in trust for the plaintiff, or from his claiming any interest in the slaves or land, he, the plaintiff, in January, 1829, wrote and entered into an agreement with the dc-fendant for the occupation of those lands by the plaintiff for three years upon a rent of $48, and for the use of the slaves without charging the defendant any thing for keeping the negroes, or being charged any thing therefor by the defendant, but that the one party might give up, or the other take, tile negroes whenever they might respectively choose. The answer further states that the price given'by the defendant for the negroes was a fair and full price at the time, and that the sale was fair and open: that the defendant had no use for the negroes until the latter part of the year 1831, and then sent for them, and the plaintiff gave them up promptly, and without then setting up any title or interest in them, or doing so at any time after the sale, until one or two months before the filing of the bill, late in the year 1837; when he wásinduced to apply for redemption by the increase in the family and the very high prices of slaves at that period.
 

 To the answer replication was taken, and the parties proceeded to take voluminous proofs.
 

 As exhibits, the plaintiff put in his deed of trust
 
 to
 
 Burton, dated July 20th, 1825; ahd also a letter from the defendant to the plaintiff, bearing date November 11th, 1827,
 
 *162
 
 in the following words:
 

 « Dear gj,
 
 }
 

 I have received yours by your son. 1 am really sorry that after so'large a stretch as I have made in your property, you Can get no person that will do any thing for you in balance. I have made a purchase in Spartanburg that I must meet, when I come home; as Mr. B., from whom I bought, is moving to Georgia. But, still, with all these difficulties, if you can get, as you state, Mr. Robert Burton and two more to join in, I will be one of them, to try and save the property, rather than it shall fall a sacrifice in the hands of those that would, in no case, favor you.”
 

 It is not requisite to set' out all the numerous depositions taken in the cause, but only their material parts.
 

 Hugh L. Wilson
 
 states, that he Was'the crier at the sale, and just as he was going to sell the negroes, either the plaintiff or defendant called him to them; and Hoke said to Abernathy, “cheer up, and do not be cast down, that he had befriended him, and was disposed to do it still. All he wanted was his own — to pay him his money and the interest, and take his negroes back at any time.” He says, he does not recollect' that Abernathy made any reply; and that he never heard any other conversation between the parties respecting the negroes. That Hoke bought Sue and three of her children — the price he does not recollect, but thinks upwards of $900; which he did not. consider a fair price.
 

 W. M. Black
 
 deposes that he was at the sale, but does not know the number or description of negroes purchased by Hoke, nor the prices; that in passing about, either before or after the sale, he came near Abernathy and Hoke, and heard the latter say to the former, “that
 
 he need not be
 
 uneasy about the property he had bought or was about to buy; that if it was seven or eight or ten years, so that he got his money and interest, it was all he wanted:” which is all the witness knows.
 

 S. J, Little
 
 stales, that he was,, at the sale, and that after the negro woman and her children had been cried some time,
 
 *163
 
 Hoke; Abernathy and Wilson, went aside ten or fifteen steps and talked together; after which they returned into the company and the negroes were knocked down to Hoke. The witness states that 'the woman and her five children were sold in a lump, and brought perhaps, three hundred, or four or five hundred dollars; but that he thought they were worth over $1,000. He says, that in the evening, he asked Wilson how it happened, that this lot of negroes sold so- much cheaper than the others, and he replied, that Hoke had bought them to save -them for Abernathy, who was to have them upon paying up the money and interest.
 

 Samuel B. Abernathy
 
 says that ho is the son of the plaintiff, and that at the sale, a negro by the name of Mingo,’ who was the husband of the woman, was purchased for one Dogharty, and that the winter after, or the winter of the next-year after, Hoke applied to Dogharty to purchase him. He then said, he was to have bought him at the sale with the rest, for the plaintiff, who was to redeem them at any time afterwards; and that his reason ior not buying Mingo was, that he went too high. Dogharty observed, that the plaintiff would never be able to redeem them, to which Hoke replied, that he probably would, for as he had failed once, he might take better eare hereafter. Dogharty was then in debt to Hoke, and soon after confessed judgment; and subsequently Hoke did buy Mingo.
 

 Four witnesses,
 
 E. Davidson, A. McCorkle, W. Little
 
 and
 
 R. A. Brevard,
 
 state that Hoke bid for most of the ne-groes that were offered for sale; and that it was understood by them, and, they think, the company, that there was some arrangement between Hoke and Abernathy, under which the latter was to have some benefit from Hoke’s purchases, and, probably, the right of redemption. Abernathy requested Davidson not to bid, as he wished Hoke to become the purchaser. Whenever Hoke made a bid, it excited a remark in the company, that he was buying for Abernathy’s benefit, and that such belief induced these witnesses not to bid as high as they otherwise would, though they cannot state the prices at which the negroes sold that day, nor the lots in which they were offered, nor the purchasers — that Hoke did
 
 *164
 
 not, as far as they perceived, contribute to the belief they entertained as to the purpose of his purchases; nor, as far as they know, had he any knowledge, that such an impression at all prevailed. And they state that the price of negroes was then very low, especially at cash sales.
 

 On the other hand Mr. Burton, who made the sale as trustee, says that he heard of no such understanding between the parties, nor of an impression to that effect in the company — that many of Abernathy’s creditors were present and bid, and that all the negroes, as well those purchased by Hoke as the others, brought full prices, as negroes about that time sold' — that such was his opinion at the time, and the opinion generally expressed by others also. He states that Sue had nine children, of which five were sold separately, and of those Hoke bought two, and that the other four were sold with their mother on account of their ages at $632. The negroes were all sold in the order requested by Abernathy; and when all had been sold except the last lot, and it was found that a balance of the debts was to be raised exceeding $>200, he requested that the young children should beset up with the mother. When sold, they brought $301 more than paid the debts, and that surplus was paid by Hoke to Burton, and by him to Abernathy, in cash, or to his other creditors on his orders; and that subsequently, he, the trustee, by the directions of Abernathy, conveyed one of the tracts of land, which remained unsold, to one Little; and the other, containing 100 acres, on which Abernathy lived, he conveyed to Hoke, who had purchased it at Sheriff’s sale.
 

 Ephraim
 
 Brevard,
 
 H. Fullenw eider, John Boyd
 
 and
 
 John Killian
 
 depose that the price of slaves was depressed at the time of this sale; but that they were present at the pale, aud that these negroes sold remarkably high for their ages and appearance. Mr. Brevard became the purchaser of one of the children of Sue, and he also bid against Hoke for the girl Jane, bought by the latter, and was the last bidder for her except Hoke. Mr. FuIIenweider also purchased another of Sue’s children, and wished to buy others, but declined doing so on account of the high prices to which they ■were run. He says he would not give as much for Sue and
 
 *165
 
 her children as Hoke did, and that a great many persons were in attendance, who wished to buy negroes, but were prevented by the prices bid by Hoke and the other creditors of Abernathy. Boyd and Killian went to the sale with the intention of buying, but did not, as the negroes sold for more than they thought they were worth: and the former states a purchase made by himself from another person on much better terms. To the character of Hugh L. Wilson twelve persons are examined, who depose that he is unworthy of credit, and has been so deemed for many years.
 

 The defendant put in and proved the following letter to him from the plaintiff;
 

 <! Dear Sir,
 

 I have understood several people have it in contemplation to try to purchase some of the negroes you have here with me. As I know that necessity will be no inducement for you to sell, I hope you will refrain until I see you. I have no doubt from the improvement that I have made and expect to continue to make, that application will.be made for this plantation. I also want you to refrain from selling until I see you, which perhaps may not be until court. I have started a threshing machine which. I find will be very useful in making manure. At this time there is the straw and chaff of more than 300 bushels of wheat, lying scattered for manure and constantly increasing. I shall have the thrashing of more than 1,000 bushels of wheat this season.
 

 . Yours Ac.
 

 R. A.
 

 N. B. A tract of land adjoining this will probably be sold by the sheriff at Court, as the property of James Nixon. The land is well timbered, and of an excellent qua’ity.”
 

 The foregoing letter is without date, but, from the reference to the sale of Nixon’s land, it is admitted to have been written in the summer of 1828.
 

 Henry Cansler, then the sheriff of Lincoln county, proves that in July, 1827, he sold, under executions, fhe tract of 100 acres, op which the plaintiff lived, to Hoke, for $599:
 
 *166
 
 aód that in July, 1828, he also sold the Nixon land, adjoin - *n° the other, and that Hoke purchased it for $302 50 cts. This witness also proves the two contracts between the plaintiff and defendant, which follow, and that they were drawn by the plaintiff himself. The one is:
 

 “An agreement between John Hoke and Robert Abernathy: Whereas the said Hoke did, some time since, purchase' a family of negroes at public sale, formerly the property of said Abernathy, which negroes have continued with said Abernathy: Now he agrees not to make any charge for keeping them heretofore or hereafter, but has the liberty of giving them up to the said Hoke at any time he pleases. And the said Hoke agrees to make no charge on the said Abernathy for the time past, nor for the time he may let them stay with the said Abernathy; and the said Hoke is to take them at any time he pleases. In witness &c. February 18th, 1829. (Signed)
 

 ROBERT ABERNATHY. JOHN HOKE. ”
 

 The other is:
 

 “ Articles of agreement made between Robert Abernathy and John Hoke, both of Lincoln county. The said Hoke agrees to let the said Abernathy have the use of the plantation and machines,¡whereon the said Abernathy lives, for the term of three years; for which uses the said Abernathy doth bind himself &c. to pay to the said Hoke the sum of $48 annually. It is to be understood that the said Abernathy is to receive no compensation for any improvements or repairs that may be done on the plantation or buildings; and in case the said Abernathy should die, the same use and privileges are to extend to his family by complying with the above terms. In witness &c. this 18th of February, 1829.
 

 (Signed) ROBERT ABERNATHY. JOHN HOKE. ”
 

 The last deposition, which it is material to state, is that of
 
 David Hoke,
 
 who is a son of the defendant, and has been
 
 *167
 
 examined on the part of the plaintiff to prove-the admissions of his father, that the purchase- was made to favor , , ; ,
 
 ,
 
 thy, or that he was to have the liberty of redeeming them. The witness denies that he ever heard any thing of the kind from his father; and says that his father sent him for the ne-groes in the latter part of the year 1831, and that the plaintiff gave them up, without setting up any claim to them or
 
 right to
 
 redeem, and expressed the wish that the defendant would purchase Sue’s other children from those who bought them, so as to get the whole family together.
 

 If the court were at liberty to decree for the plaintiff upon a copjecture, that there was some friendly intention on the part of the defendant to favor the plaintiff by letting him have the use, upon advantageous terms, of such negroes as he might buy, or even that he had-the purpose of letting him have the negroes back, if he should be able, in a reasonable time to pay the price he' gave and- interest, then the case made by the plaintiff might be deemed a; plausible one for the relief he seeks. But we cannot take away from the defendant the benefit of his purchase, but upon plain evidence of undue advantage taken of the plaintiff or imposition on him, or upon proof of a distinct agreement for redemption. And, upon the consideration of the evidence in the cause, we are not able to discover any such ground, on which the relief can be founded.
 

 The plaintiff alleges that there was a contract for redemption, explicitly made between him and’the defendant before the day of sale; and that he once had a letter from the defendant, which distinctly stated or recognized the contract, but that the defendant got it into his possession and destroyed it. But the answer unequivocally denies the whole statement, both in its substance and details. The defendant admits that something had passed between them, before the sale, upon the subject of his purchasing; but he denies that it had any reference to a purchase for the plaintiff or to a redemption of the negroes, unless in the single case1 that he might pay all the debts secured by the deed and take an assignment of it, with the view of securing the sum then advanced and his previous demands. But that failed, because.
 
 *168
 
 the trustee declined selling in that wáy, and, moreover, be- ' , as appears by ail exhibit and CanSler’s testimony, the included in the deed of trust were then levied on by the sheriff for other creditors, arid were subsequently sold for their benefit. The answer then states positively, that there tvás no other agreement or understanding for the defendant’s g'etting a security; but that he purchased solely oh his own account. cause
 

 That statement of the answer the plaintiff controverts, upon the grounds that such agreement was made in parol on the day of sale, in the presence of Hugh L. Wilson; and that it is likewise established by the subsequent declarations ot the defendant; and also that its existence and nature arb to be inferred from the facts, that the defendant purchased for inadequate prices, and that the plaintiff retained the possession of the slaves, after the sale, for several years, without-accounting for the- hire.
 

 Théonly direct evidence of the agreement, alleged in the-bill, is that of Hugh L. Wilson. He does establish it, if he is to be believed. Brit several circumstances concur to produce doubts of the correctness of his recollection or of his •veracity. It is singular that he alone, and with a doubtful character, should have been selected, out of a large crowd, as the witness, to whom these persons should confide their agreement, especially as there was.no injunction on him not to divulge it, and he did, as it is said, make it known to at least one person that evening. Brit, besides, his memory seems tó be too unsafe
 
 to
 
 entitle him to full credence. He states that Hoke purchased Sue and
 
 three
 
 of her children, and that he gave for
 
 them
 
 about $900, which be deems riot to be a fair price. He takes no notice of the other three children, which, all agree, and the bill states, were purchased by Hoke; and, so far, from $900, or rather $954 — the price actually given — not havirig been a fair one for Sue and (he three yougest children, it is at least doubtful, whether that sum was not the full value of the mother and the six children. But it is an unpleasant duty to discuss in detail questions of verácity, and, therefore, the subject may be dismissed with the rémark, that this witness is so entirely dis
 
 *169
 
 credited by the many persons, who have been examined to his character, that the court is constrained to lay his ny out of the case altogether. It is too unsafe to decree the testimony of a person, who is-proved to be so wholly tin-worthy of belief.
 

 That conclusion dispenses also with the testimony of S« J. Little; which was only material as tending to sustain the credit of the preceding witness. But, in passing, we cannot fail to notice how very uncertain the recollection of most persons is as to remote tranactions, in which they felt no interest. This witness states that he saw the parties privately conversing with Wilson, after the'sale of the woman and children had gone on for some time; whereas Wilson himself says, that it was before the sale began that he heard the conversation. Moreover, Little says, that the woman and
 
 her Jive
 
 children were sold together, and brought between $300 and $500, though he thinks they were worth $1,000; whereas it is clear, that the woman and
 
 four
 
 children were sold in a lot for $632, and that the other two were sold separately for $322, making in the whole g>954. Nothing can exhibit in stronger contrast the superior effect and credit, which the mind is obliged to yield to written documents, above that due to the vague statements of persons, in no wise concerned to understand correctly or to remember perfectly, a remote transaction, and, especially, if it be one, of which a doubt might have been entertained at the time, as to its true character.
 

 The foregoing observation is peculiarly applicable to 'the testimony of the witness Black; who deposes that he heard Hoke say to the plaintiff on the day of sale
 
 “
 
 that he need not be uneasy about the property, for that, if he got his money and interest in eight or ten years, it was all he wanted.” If there was a credible witness, who testified to a contract, communicated in all its particulars to him, the testimony of Black might materially support the other witness, and induce the court to decree, notwithstanding the remoteness of the transaction or other circumstances against it. But, as evidence in itself of the contract between these parties, it is en-This was not called to take
 
 *170
 
 tice oí the terms of a contract the parties were then malting. Nothing was comipunicated to him intentionally. He casually heard a single sentence of, probably, a full conversation, to no other part of which is he able to depose. And, even as to what he did hear, he cannot say, whether it occurred before or after the sale, or respected negroes which the defendant had bought or was about to buy. It would be dealing most unfairly with the meaning of a person, if a sentence or part of a sentence, torn from the context, and thus casually caught, were to be the ground oí a judicial decision.
 

 The plaintiff’s case is thus left to rest on the testimony of his son, Samuel B. Abernathy, who deposes to an admission of the defendant, that he purchased this family of negroes for his father, who was entitled to redeem them at any time. This admission was not made to the plaintiff, or with a view that it should bo communicated to him, or to furnish evidence of the agreement for the purpose of subsequently establishing it. But it was an incidental observation, dropped in the course of a negotiation with a third person for the purchase of the husband of this woman. It might have been made with a view to influence that purchase, or from some motive that cannot now be made to appear, it would seem extraordinary, if there had really been a definite agreement for redemption by the plaintiff from the beginning, that the parties, and especially the plaintiff, should not have put it into some permanent form, or, at least, have called several persons, intelligent, disinterested, unconnected, and of good character, to attest it: so that, upon the death of one of the parties or his denial, the existence and terms of the agreement could be established beyond doubt. But, instead of that, we find this attempt to prove it by the accidental acknowledgment of it in the presence of the plaintiff’s son near a year or two years subsequently. It is, however, competent evidence, and might, therefore, be the ground of relief, if it stood uncontradicted, or was consistent with other unquestionable facts which appear in the cause. But as little as we are disposed to refuse to this statement the faith, that such words were spoken by the defendant, the court cannot infer from them the conclusion, that, at or before the
 
 *171
 
 sale, an agreement, a conclusive contract, was formed by these parlies for the purchase and redemption of the slaves as charged in the bill. In the
 
 next
 
 place, if there had been such an agreement, probably, most probably there would have beeii some other evidence of it, like that before suggested. Again, if there were some understanding or vague expectation of the sort, as perhaps may be collected from the
 
 testimony of
 
 this witness, the letter of the defendant to the plaintiff of the 11th of November, 1827, and the continued possession of the plaintiff; such, notwithstanding, must have been terminated, and ihe plaintiff’s expectation absolutely abandoned in the year 1828. The .price given by the defendant will not help the plaintiff. Its inadequacy is not.established. Four persons think the negroes might have brought more, if there had not been an impression, that Hoke intended to favor the plaintiff. But
 
 even these
 
 persons cannot state the values or actual prices, and were in truth not concerned to notice or remember them. On the other hand, the seller of the slaves and the creditors of the plaintiff who were concerned that the property brought its value, and who bid against the defendant and also purchased some of the negroes, say, that all the negroes sold well, and that the' defendant, particularly, gave more than they were willing to give for those purchased by him. Inadequacy of price, if existing, would furnish an argument for the plaintiff. • On the contrary, a fair and full price given, and no security taken, for the sum thus advanced, strongly implies an absolute and not a redeemable purchase. The price, therefore, furnishes another objection to declaring, upon the testimony of S. B. Abernathy, that the plaintiff had such right of redemption at the filing of his bill.
 

 That he had not, we feel obliged to declare upon the evidence of the defendant, independent of his answer; that being evidence of a character which makes an impression on the miud, on which it reposes with confidence. It consists of written documents under the hand of the plaintiff himself. The first is his letter written in the summer of 1828. It is clear, that the plaintiff was then reduced to destitution' of property. His lands had been all sold soon after his ne- •
 
 *172
 
 groes: The letter of the defendant of November, 1827, which the plaintiff read, shews that the residue of his property, consisting of his stock and household stuff, was then probably sold, and.the bill, indeed, states the fact. How, af-. ter that, could he expect or hope to redeem the negroes, except out of the negroes themselves? That he had no such expectation is absolutely certain, if we are to judge from his own words in his own letter in the summer of 1828. He pretends not therein to any interest in the slaves, more than in the land, which the plaintiff had then purchased; but treats them all as the defendant’s own property: asking, merely as a favor, that he would not sell them till he could see him at court. He states, that he is making such agricultural improvements on the farm, as might induce the defendant to consider it his interest to retain it, and allow him to occupy it, and he advises him to purchase an adjoining tract, which was shortly to be sold, and which the defendant did buy. What can be inferred from this letter, but that the plaintiff was asking, as a favor, that the defendant would make no such disposition of the property,
 
 real
 
 or personal, as would deprive him of the use of it. But it was the use of it, as the property of the defendant, and as a kindness to plaintiff, and not as the property, legal or equitable, of the. plaintiff himself, and upon a claim of right. Accordingly we find that the defendant bought the Nixon land, and that, ip the beginning of the next year, 1829, he let the lands to the plaintiff for three years, and also came to an agreement lor the slaves remaining with the plaintiff during the will of both. Those agreements are also in writing, so that their terms and objects cannot be mistaken. They were drawn, up by the plaintiff himself; and they cannot be read, without perceiving instantly, that they are absolutely inconsistent with the notion of any interest in the land or negroes
 
 then
 
 being in the plaintiff or claimed by him. He stipulates to pay rent for the land $48; less indeed than the interest on the sum of $90L 50 cts,, which the defendant gave for the whole tract. If the land and negroes had been held as a mere security, would they not have been included in one agreement,' and the rent reserved equal to the interest on the
 
 *173
 
 price of the whole? Or if the negroes had been thus held, would there not have been some arrangement for paying the interest on the sum given for them? But nothing of that kind appears. On the contrary, the plaintiff treats them as exclusively the property of the defendant. They were, in point of annual value, worth, as servants in the plaintiff’s family, about the expense of keeping such a family, then increasing. The plaintiff agrees to keep them without charge, and without paying hire; and each party is to put an end to this agreement when he pleases, the plaintiff by sending the negroes to Hoke, and the latter by taking them away. The profit of Hoke upon the slaves was not the interest on the money he paid for them, but the increase of the slaves, which belonged to him as owner. This agreement, therefore, removes the last remaining circumstance, on which the bill is founded; namely, the continued possession of the plaintiff. That possession is explained; and it is seen, that it was not continued, because the plaintiff claimed the negreos or any interest in them, but that it was under the defendant and at his will. The absolute property of the defendant could not have been more distinctly acknowledged by any act or language from the plaintiff. Then to those documents we add the negative, but not less convincing, evidence, that at no time, during a period of upwards of ten years, did the plaintiff set up to the defendant, though residing in the same county, any claim of this kind, nor indeed did he assert such a claim to any person. Such a perfect silence for such a length of time, respecting a right of this sort, of such immense importance to the plaintiff, is contrary to all experience of the ordinary conduct of men; and, with the other circumstances and documents just mentioned, it overbears the feeble inference from the singular evidence of the defendant’s declarations. We are obliged, therefore, to declare, that the plaintiff’s case is not made out by the proofs, and that his bill must be dismissed' with costs.
 

 Per Curiam, Bill dismissed with costs.